2:19mj541

## AFFIDAVIT

OCT 17 2019

I, Kevin B. Cox, being duly sworn, depose and state as follows:

### EXPERIENCE AND TRAINING

1. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, I am an officer of the United States who is empowered by law to conduct investigations of and make arrests for violations of federal law. I am a sworn Special Agent with the Drug Enforcement Administration Department and have been employed as such since February 12, 2000. I was previously employed by the Hanover County Sheriff's Office as Uniform Patrolman, and Narcotics Investigator from 1994 until 2000. I am currently assigned as a Special Agent of the Drug Enforcement Administration (DEA) Norfolk Resident Office (NRO). I have extensive training emphasizing narcotic investigations and enforcement, to include training on laundering of drug proceeds. I am familiar with the habits and practices, of individuals engaged in violations of controlled substance laws and has over 25 years of experience in narcotics investigations. I have conducted and has assisted in investigations into the unlawful possession, possession with intent to distribute, and distribution of controlled substances, and associated conspiracies, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, to include search and seizure, surveillance, intelligence, arrests, interviews, interrogations, Title III wire intercepts, and drug interdiction.

2. I have conducted complex multi-jurisdictional investigations. I am familiar with the ways in which traffickers conduct their business, including, but not limited to: their methods of importing and distributing illegal drugs, their use of communications facilities to arrange for and coordinate those distributions, the use of codes to conduct transactions, and the financial vehicles utilized by those traffickers to launder the proceeds of their illegal drug transactions.

3. I am familiar with the facts and circumstances of this investigation, as a result of the information received by me and summarized in the reports I have reviewed. I have compiled information derived from discussions and interviews with experienced law enforcement officers and agents. I have not set forth each and every fact learned during the course of this investigation, but have only set forth those facts that I believe are relevant to establish probable cause.

4. I submit this Affidavit in support of a criminal complaint and arrest warrant charging CLEVELAND VERNON HUNT, III, with distribution of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

**FACTS SUPPORTING PROBABLE CAUSE**

5. Since October of 2018, Norfolk DEA agents and Portsmouth narcotics detectives have been investigating the heroin trafficking activities of CLEVELAND VERNON HUNT, III, and other associated with him. This investigation was initiated based on information provided by narcotics detectives of the Portsmouth Police Department.

6. On October 24, 2018, under the direction and control of law enforcement, a Confidential Source (referred to as "the CS") met with CLEVELAND HUNT in Norfolk to negotiate prices for future heroin transactions. During the meeting, the CS and HUNT negotiated the price of 3.5 grams of heroin for $300 and an ounce for $2,400. Additionally, HUNT stated he could sell an ounce of "raw" heroin for $2,800. HUNT went on to state the "raw" heroin would "stand on a two." In my training and experience, individuals who sell narcotics will often add a cutting agent such as mannitol (or other non-illicit powder substances) to powder heroin and cocaine to add volume to the drugs, yielding higher profit. The phrase "stand on a two" refers to adding cutting agent to the heroin in a 2-to-1 ratio, attesting to the quality of the heroin.



2

The CS expressed interest in conducting heroin transactions in the near future, HUNT agreed and then left the meeting. Agents conducted surveillance for a brief period of time however, HUNT executed several counter-surveillance measures which required them to terminate surveillance.

7. On November 5, 2018, at approximately 2:09 p.m., under the direction and control of law enforcement, the CS attempted to call HUNT twice at (757) ***-6356, but received no answer. Minutes later, HUNT called the CS back. During the conversation, the CS requested an ounce of heroin. HUNT agreed, and told the CS to meet him at Military Circle Mall in Norfolk. The CS was outfitted with audio/video recording devices and searched before and after the transaction with negative results. The CS was also provided with $2,800 in government funds to make the purchase. HUNT and the CS initially met at a store inside the mall, then walked towards an exit near the movie theatre section. HUNT stated he misunderstood the CS on the phone and only brought ½ ounce of heroin with him. The CS agreed to purchase the ½ ounce for $1,300 cash, and they made the transaction. The CS received a clear plastic bag from HUNT containing four smaller clear plastic bags of suspected heroin. The CS returned to a predetermined location and turned over the suspected narcotics and $1,5000 left over cash to detectives. The suspected narcotics were properly packaged and vouchered and sent to the DEA Mid Atlantic Lab for testing, which came back as 13.8 grams of heroin.

8. On November 9, 2018, under the direction and control of law enforcement, the CS contacted HUNT at (757) ***-6356 to make another purchase of ½ ounce of heroin. HUNT agreed, and they arranged to meet at Military Circle Mall again. The CS was outfitted with audio/video recording devices and searched before and after the transaction with negative results. The CS was also provided with $1,500 in government funds to make the purchase. At 2:51 p.m.,



HUNT arrived at the mall parking lot driving a white Chevrolet Suburban. The CS got into HUNT's vehicle and exchanged $1,500 for heroin while they drove around the parking lot. HUNT then dropped the CS off at the mall and left the area. The CS returned to a predetermined location and turned over the narcotics to detectives. Approximately 20 minutes later (while the CS was being debriefed by detectives, HUNT called the CS and said he had given the CS the wrong package of heroin, which had an extra 5 grams (and was intended for someone else). HUNT asked to meet to exchange packages, but the CS was directed by agents to inform HUNT that the CS had already arranged to sell the newly acquired heroin. The CS agreed to pay HUNT for the extra 5 grams in the next few days. The suspected narcotics were properly packaged and vouchered and sent to the DEA Mid Atlantic Lab for testing, which came back as 20.89 grams of heroin.

9. On November 14, 2018, at approximately 2:19 p.m., under the direction and control of law enforcement, the CS contacted HUNT to arrange for another purchase of heroin. HUNT advised that he was already at the mall, and agreed to sell the CS one ounce of heroin for $2,600. The CS also agreed to repay HUNT $650 dollars for the excess 5 grams from the previous buy (for a total of $3,250). The CS was outfitted with audio/video recording devices and searched before and after the transaction with negative results. The CS was also provided with $3,250 in government funds to make the purchase. At 2:24 p.m., the CS met HUNT at the Military Circle Mall parking lot in a vehicle driven by a female (HUNT was in the passenger seat). The CS got into the rear passenger seat as the female circled the parking lot. The CS provided HUNT with $3,250 and HUNT provided a package of heroin. Once the transaction was complete, the CS was dropped off and HUNT and the female left the area. The CS returned to a predetermined location and turned over the narcotics to detectives. The suspected narcotics were properly packaged and



vouchered and sent to the DEA Mid Atlantic Lab for testing, which came back as 28.15 grams of heroin.

10. On December 7, 2018, at approximately 1:22 p.m., under the direction and control of law enforcement, the CS contacted HUNT and ordered one ounce of heroin for $2,800. HUNT agreed to meet the CS at Military Circle Mall. The CS was outfitted with audio/video recording devices and searched before and after the transaction with negative results. The CS was also provided with $2,800 in government funds to make the purchase. At approximately, 2:34 p.m., HUNT called the CS and said he was in the rear area of the movie theatre parking lot. At approximately 2:35 p.m., the CS got into the HUNT's vehicle and they made the transaction exchanging $2,800 for an ounce of heroin. The CS returned to a predetermined location and turned over the narcotics to detectives. The suspected narcotics were properly packaged and vouchered and sent to the DEA Mid Atlantic Lab for testing, which came back as 28.02 grams of heroin.

11. On December 18, 2018, at approximately 1:22 p.m., under the direction and control of law enforcement, the CS called HUNT and ordered one ounce of heroin for $2,800. HUNT agreed to meet the CS at Military Circle Mall. The CS was outfitted with audio/video recording devices and searched before and after the transaction with negative results. The CS was also provided with $2,800 in government funds to make the purchase. At approximately, 4:58 p.m., HUNT called the CS, and said he was in the rear area of the movie theatre parking lot. The CS got into HUNT's vehicle, provided him with $2,800, and HUNT gave the CS an ounce of heroin which he retrieved from the center console. The CS got out of HUNT's car, returned to a predetermined location, and turned over the narcotics to detectives. The suspected narcotics were



properly packaged and vouchered and sent to the DEA Mid Atlantic Lab for testing, which came back as 27.87 grams of heroin.

12. On May 10, 2019, Virginia Beach police conducted a traffic stop of a silver BMW driven by CLEVELAND HUNT after he was observed disregarding a stop sign. DEA agents who had been conducting surveillance of HUNT earlier, approached and advised him that DEA had made five controlled buys of heroin from him and wanted to speak with him. HUNT replied, "You don't have shit on me." HUNT was then asked by agents to exit the vehicle and was taken into custody. Special Agent J. Faddis immediately noticed that HUNT had what appeared to be a baggie of white powder, in plain view, protruding from his left front pants pocket, and two baggies of suspected heroin were recovered from HUNT's pocket. HUNT was issued two summons for disregarding a stop sign and window tint. HUNT was subsequently taken to the Virginia Beach Police Department fourth precinct, and placed in an interview room.

13. At approximately 11:47 a.m., Agent Cox advised HUNT of his rights. HUNT acknowledged he understood his rights, and agreed to cooperate with agents. During his statement HUNT admitted, among other things, that the substance recovered from his pockets was heroin and that he had been involved distributing heroin for the past year.

14. During the search of HUNT's vehicle, agents found paperwork from the Storage Mart in Virginia Beach referring to storage unit #2111. HUNT gave agents consent to search, and advised there was a gun in the storage unit. According to HUNT, a heroin addict from Currituck, North Carolina traded the rifle for a heroin debt. During the search, agents located a Bushmaster BFI 5.56 NATO rifle #BK5029029 and a .38 caliber Smith and Wesson revolver, serial number 495523. According to HUNT, both guns were traded to him for a few grams of heroin. NCIC records indicate the Bushmaster rifle was stolen from Currituck, North Carolina.



## CONCLUSION

15. Based on the foregoing, I believe that there is probable cause to charge CLEVELAND VERNON HUNT, III, with the distribution of heroin, a schedule I narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and ask that an arrest warrant be issued.

FURTHER, YOUR AFFIANT SAYETH NAUGHT.

Kevin B. Cox
Special Agent
Drug Enforcement Administration

Reviewed and approved:

Sherrie Capotosto
Assistant United States Attorney

SWORN AND SUBSCRIBED TO BEFORE ME, this 17th day of October 2019.

UNITED STATES MAGISTRATE JUDGE
At Norfolk, Virginia

